UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ELIAS SHEHADEH,

                        *Plaintiff,*

      -against-

HORIZON PHARMA USA, INC.,
and ABC CORPORATIONS 1-5,

                        *Defendants.*
-----------------------------------------------------------------X

**Docket No.:**

**COMPLAINT**

**PLAINTIFF DEMANDS
A JURY TRIAL**

Plaintiff Elias Shehadeh, as and for his Complaint, respectfully alleges, all upon information and belief, as follows:

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C §1331, in that certain of the Plaintiff's claim arise under the laws of the United States, namely the False Claims Act, 31 U.S.C. §3730(h), and supplemental jurisdiction exists pursuant to 28 U.S.C. §1367 over the remainder of Plaintiff's claims under the New York False Claims Act, Finance Law §191, and Labor Laws §740 & 741.

2.     Venue is proper under 42 U.S.C §2000e-5(f)(3) and 28 U.S.C §1391(b) because the Defendant resides in and does business within the Southern District of New York and Plaintiff performed work within this District.

## IDENTITY OF PARTIES

3.     At all relevant times mentioned herein, Plaintiff Elias Shehadeh ("Shehadeh") was employed by Defendant Horizon Pharma USA, Inc. ("Horizon Pharma") until his unlawful termination on October 10, 2019, in retaliation for his protected complaints.

4.      At all relevant times mentioned herein, Horizon Pharma is a biopharmaceutical company focused on researching, developing and income

5.      medicines that operates around the globe, including in New York State, where Shehadeh was employed.

6.      Defendants ABC Corporations 1-5 are sued herein under fictitious names for the reason that, after diligent and faithful efforts to ascertain their names and identities through review of corporate filings, their true names and identities are presently unknown to Shehadeh except that they were connected in some manner with Horizon Pharma and/or were individuals, corporations, business entities, partnerships, agents, services, representatives, co-venturers, associates, companies or other entities who engaged in the activities alleged herein and/or were in some manner responsible for the damages inflicted to Shehadeh and/or were, in some manner, related to Horizon Pharma and Shehadeh prays for leave to insert herein their true names, identities, capacities, activities and/or responsibilities when the same are ascertained.

## BACKGROUND RELEVANT TO THE CAUSE OF ACTION

7.      Shehadeh commenced his employment with Horizon Pharma in or around November 2014, as a Rheumatology Sales Specialist ("RSS").

8.      Shehadeh, who holds a Doctor of Medicine ("M.D.") degree, was responsible for marketing Horizon Pharma's rheumatology products to medical providers throughout the greater New York City metropolitan area, including the Bronx, Westchester and Rockland Counties.

9.      At all relevant times, Shehadeh was fully qualified for his role, as confirmed by the positive sales numbers he achieved and the fact that he was twice named to the President's Club, a prestigious honor reserved for successful employees.

2

10. In or around 2016, Shehadeh also began representing a Horizon Pharma product called "Krystexxa," a medication delivered by infusion that treats severe gout.

11. Given the risk of side effects associated with the intravenous infusion procedure, Krystexxa must be given to patients at a medical facility that is certified to perform an infusion, and has the proper equipment and capability.

12. Shehadeh would work with medical providers, including podiatrists, to make them aware that they could refer patients to a rheumatologist, who could then prescribe Krystexxa.

13. On Thursday, September 12, 2019, Shehadeh made a routine call to Dr. Oliver S. Kurucz ("Dr. Kurucz"), a rheumatologist with whom Shehadeh had built a relationship.

14. During that visit, Dr. Kurucz notified Shehadeh that he had sent a patient to be infused with Krystexxa, but that instead of sending that patient to Good Samaritan Hospital, where he had previously sent the patient, Dr. Kurucz had sent the patient to a facility called STAT Health Urgent Care ("STAT Health").

15. Shehadeh knew this was a problem because STAT Health is not certified to provide infusions, unlike Good Samaritan Hospital and other facilities to where Dr. Kurucz had previously sent patients for infusion, so he asked Dr. Kurucz what made him think to send Krystexxa patients to STAT Health.

16. Dr. Kurucz responded that the Friday before, he had met with John Murray ("Murray"), a Specialty Account Manager ("SAM") at Horizon, and his District Manager Vincent Latronica ("Latronica"), at which time Murray had told Dr. Kurucz that if he started sending his patients to STAT Health, they would make him the "top speaker" for Krystexxa, which Shehadeh knew would be a prestigious position for which Dr. Kurucz had been denied earlier that year, and

which would pay approximately $1,500 to $2,000 for each speaking engagement.

17.     Dr. Kurucz said that, as a result of what Murray and Latronica had told him, he had sent the patient to STAT Health for his Krystexxa infusion.

18.     Shehadeh identified two serious problems with what Dr. Kurucz told him concerning Horizon's promises to Dr. Kurucz.

19.     First, Shehadeh was aware that the facility where Dr. Kurucz had been sending his Krystexxa patients for infusion was covered by Section 340B of the federal Public Health Service Act (currently codified as 42 U.S.C. §256b), which requires that the facility providing the service, in this case an infusion, receive the best price possible for the drug, since the procedure is covered by Medicaid and Medicare Part B.

20.     Shehadeh knew that STAT Health was not covered by Section 340B, and that Horizon wanted patients go to a non-340B facility so that it could receive greater revenue for the Krystexxa infusion, which the pharmacy who provides the drug, AhmaRx, charges $16,000 to $18,000 every two weeks for as long as the treatment lasts, an amount that is greater than what is charged by a 340B facility.

21.     Second, Shehadeh knew that Horizon offering to make Dr. Kurucz the "top speaker" for Krystexxa was unlawful under the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), which prohibits anyone from receiving or offering "any remuneration (including kickback, bribe, or rebate") when payment for the services involved "may be in whole or in part under a Federal health care program."

22.     Dr. Kurucz stated to Shehadeh that he had actually followed Murray's direction and sent a Krystexxa patient to STAT Health to be infused, but the patient had been distressed at being

sent somewhere different than Good Samaritan Hospital and declined the medication, even though

both Dr. Kurucz and a representative from Horizon Pharma tried to call the patient and his wife.

23.     Shehadeh, still on September 12, 2019, then went to STAT Health and spoke with

Dr. Henry Okere ("Dr. Okere"), who advised Shehadeh that STAT Health did not provide

infusions.

24.     Dr. Okere also told Shehadeh that, on or about Wednesday, September 4, 2019, he

had lunch with Murray, his Manager Latronica, as well as a representative from the pharmacy

AhmaRx and others seeking to induce STAT Health to start offering infusions, and Murray had

stated that if STAT Health started offering infusions, Horizon would send patients from

Latronica's team, that STAT Health would receive $400 per infusion, in addition to possibly other

income from the insurance company and AhmaRx, and that Horizon had even provided a cost-

benefit analysis to STAT Health.

25.     Shehadeh knew that Murray and Latronica had improperly offered value to STAT

Health, and Dr. Okere told Shehadeh that he had asked if what they were proposing was even legal.

26.     Shehadeh realized that Murry, with the knowledge and consent of his Manager

Latronica, were improperly offering to assist medical providers to become infusion centers so that

they could send patients to non-340B facilities in an effort to generate greater revenue for Horizon

and themselves, even though doing so placed patients at risk.

27.     Shehedah immediately called his direct supervisor, Northeast District Manager for

Rheumatology Jeff Doutre ("Doutre"), but Doutre did not answer.

28.     Shehadeh was finally able to speak with Doutre later in the day, Thursday

September 12, 2019 and, during the call, Shehadeh expressed his concerns about Murray's

conduct, including the fact that that Murray conduct had placed the patient at great risk, since STAT Health, which is an urgent care facility, but not certified to provide infusions and was not equipped to handle the potential side effects associated with such an infusion.

29.     Doutre responded that he would "look into it," but warned that Shehadeh should be "compliant."

30.     That evening, Shehadeh sent Doutre an email wherein he notified Doutre about many of Murray's failings, and specifically mentioned that Murray had urged Dr. Kurucz to send patients to STAT health for infusions, even though "STAT Health DOES NOT infuse nor are they certified to infuse or have they ever infused."

31.     Shehadeh spoke with Doutre several times in the following days and continued to express his concerns that Murray was violating legal restrictions and that patient health and safety were at risk.

32.     On Thursday, September 19, 2019, Shehadeh had a call with Doutre and the National Sales Manager Ty Liberatore ("Liberatore"), where they falsely accused Shehadeh of "dissuading" a medical office from becoming an infusion facility and "disturbing" the process of a patient receiving Horizon's mediation.

33.     This was absolutely false, as Shehadeh had never "dissuaded" any facility from becoming an infusion site but had objected to Murray's unlawful and improper efforts to unsafely direct patients to an uncertified infusion facility.

34.     Shehadeh subsequently learned that the patient had become upset about being sent to STAT Health, rather than to Good Samaritan Hospital, and chose not to receive the medication, even though the patient was thereafter contacted by both Horizon Pharma and Dr. Kurucz.

35.     Shehadeh realized that Murray's improper actions were part of a larger effort to increase the income to Horizon and themselves by skirting federal and state law, and regardless of the risk to patient care.

36.     The following morning, September 20, 2019, Doutre sent Shehadeh an email that repeated this same false allegation, which was intended to intimidate and quiet Shehadeh.

37.     Shehadeh was terminated less than one month later, on October 10, 2019, based on the same false allegations that were told to him on September 19, 2019, namely that he was obstructing a patient from receiving Krystexxa.

38.     The reason Horizon proffered for terminating Shehadeh was a pretext to mask the fact that Shehadeh was really fired to punish him for protesting Horizon's illegal and dangerous actions, which violated Federal and State Law and put patients at risk.

39.     As a result of Horizon's discriminatory conduct, the quality of Shehadeh's life has been irreparably damaged and his self-esteem, self-respect and well-being have been irreversibly harmed because he was subjected to the humiliating and demeaning type of conduct described herein, all of which will continue and remain a source of financial loss, humiliation and distress to Shehadeh into the future.

**AS FOR A FIRST CAUSE OF ACTION ON BEHALF OF**
**SHEHADEH AGAINST HORIZON PHARAMA FOR RETALIATION**
**UNDER THE FALSE CLAIMS ACT, 31 U.S.C. §3730(h)**

40.     Shehadeh peats, realleges and incorporates in full paragraphs 1 through 39 of this Complaint, as though fully set forth at length herein.

41.     Each time that Shehadeh protested Horizon Pharma's unlawful conduct in violation of the law, including the Anti-Kickback Statute, 42 U.S.C. §132a-7b(b), he participated in a

protected activity under 31 U.S.C. §3730, of which Defendants were aware.

42.    Shehadeh, based on his observations and the information provided to him, had a good faith or an objectively reasonable basis for believing that he was investigating matters in support of a viable violation of the law, which reasonable belief he made known to Horizon Pharma.

43.    As a proximate result of Shehadeh engaging in protected activity, Shehadeh suffered adverse employment action, including his termination, all of which was causally connected to his protected activity.

44.    The remarkably close temporal proximity between Shehadeh's complaint about Horizon Pharma's unlawful conduct on September 12, 2019, followed by his being reprimanded for things he did not do on September 19, 2019, and then being terminated based on those false allegations on October 10, 2019, demonstrates that the real reason for the adverse action against Shehadeh was his protected activity.

45.    The aforementioned acts of Horizon Pharma constitute unlawful retaliation against Shehadeh in violation of 31 U.S.C. §3730(h) ("the False Claims Act"), which provides, *inter alia* that:

> An employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

46.    Horizon Pharma's unlawful conduct had a devastating impact on Shehadeh's employment, his financial and emotional well-being, the quality of his life and his life's normal

pursuits, which injuries Shehadeh believes will continue to cause him significant damage.

47.     As a result of Horizon Pharma's violation of the False Claims Act, Horizon Pharma is liable to Shehadeh for all the legal, non-equitable relief provided for under the law, including the remedies identified in 31 U.S.C. §3730(h)(2), which includes "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees."

48.     Horizon Pharma should also be liable to Shehadeh for punitive damages, since Horizon Pharma's intentionally or was recklessly indifferent to Shehadeh's rights for terminating him because of his protected activity.

49.     Shehadeh, therefore, seeks compensatory damages in this First Cause of Action, including among other things, for the harm inflicted upon him, in an award to be determined at a trial of this matter, as well as punitive damages, reasonable attorney's fees, the costs of this action and pre-judgment interest, in this cause of action.

**AS FOR A SECOND CAUSE OF ACTION ON BEHALF OF SHEHADEH
AGAINST HORIZON PHARAMA FOR RETALIATION UNDER
THE NEW YORK FALSE CLAIMS ACT, FINANCE LAW §191**

50.     Shehadeh peats, realleges and incorporates in full paragraphs 1 through 39 of this Complaint, as though fully set forth at length herein.

51.     Each time that Shehadeh protested Horizon Pharma's unlawful conduct in violation of the law, he participated in a protected activity under New York State Finance Law §191 ("the New York State False Claims Act"), of which Defendants were aware.

52.     Shehadeh, based on his observations and the information provided to him, had a good faith or an objectively reasonable basis for believing that he was investigating matters in

support of a viable violation of the law, which reasonable belief he made known to Horizon Pharma.

53.     As a proximate result of Shehadeh engaging in protected activity, Shehadeh suffered adverse employment action, including his termination, all of which was causally connected to his protected activity.

54.     The remarkably close temporal proximity between Shehadeh's complaint about Horizon Pharma's unlawful conduct on September 12, 2019, followed by his being reprimanded for things he did not do on September 19, 2019, and then being terminated based on those false allegations on October 10, 2019, demonstrates that the real reason for the adverse action against Shehadeh was his protected activity.

55.     The aforementioned acts of Horizon Pharma constitute unlawful retaliation against Shehadeh in violation of New York State Finance Law §191 ("the New York False Claims Act"), which provides, *inter alia* that:

> Any current or former employee, contractor, or agent of any private or public employer who is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment, or otherwise harmed or penalized by an employer, or a prospective employer, because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action brought under this article or other efforts to stop one or more violations of this article, shall be entitled to all relief necessary to make the employee, contractor or agent whole.

56.     Horizon Pharma's unlawful conduct had a devastating impact on Shehadeh's employment, his financial and emotional well-being, the quality of his life and his life's normal pursuits, which injuries Shehadeh believes will continue to cause him significant damage.

57.     As a result of Horizon Pharma's violation of the False Claims Act, Horizon Pharma is liable to Shehadeh for all the legal, non-equitable relief provided for under the law, including the remedies identified in New York Finance Law §191(1), which includes "payment of two times back pay, plus interest" and "compensation or any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees."

58.     Horizon Pharma should also be liable to Shehadeh for punitive damages, since Horizon Pharma's intentionally or was recklessly indifferent to Shehadeh's rights for terminating him because of his protected activity.

59.     Shehadeh, therefore, seeks compensatory damages in this Second Cause of Action, including among other things, for the harm inflicted upon him, in an award to be determined at a trial of this matter, as well as punitive damages, reasonable attorney's fees, the costs of this action and pre-judgment interest, in this cause of action.

### AS FOR A THIRD CAUSE OF ACTION ON BEHALF OF SHEHADEH AGAINST HORIZON PHARAMA FOR <u>RETALIATION UNDER NEW YORK LABOR LAW §740</u>

60.     Shehadeh peats, realleges and incorporates in full paragraphs 1 through 39 of this Complaint, as though fully set forth at length herein.

61.     Each time that Shehadeh protested and objected to Horizon Pharma's activity that was in violation of a law, rule or regulation, and created a substantial and specific danger to public health, he participated in a protected activity under New York Labor Law §740, of which Defendants were aware.

62.     As a proximate result of Shehadeh engaging in protected activity, Shehadeh suffered adverse employment action, including his termination, all of which was causally

connected to his protected activity.

63.     The remarkably close temporal proximity between Shehadeh's complaint about Horizon Pharma's unlawful conduct on September 12, 2019, followed by his being reprimanded for things he did not do on September 19, 2019, and then being terminated based on those false allegations on October 10, 2019, demonstrates that the real reason for the adverse action against Shehadeh was his protected activity.

64.     The aforementioned acts of Horizon Pharma constitute unlawful retaliation against Shehadeh in violation of New York Labor Law §740, which provides, *inter alia* that:

> An employer shall not take any retaliatory personnel action against an employee because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud … or objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation.

65.     Horizon Pharma's unlawful conduct had a devastating impact on Shehadeh's employment, his financial and emotional well-being, the quality of his life and his life's normal pursuits, which injuries Shehadeh believes will continue to cause him significant damage.

66.     As a result of Horizon Pharma's violation of New York Labor Law §740, Horizon Pharma is liable to Shehadeh for all the legal, non-equitable relief provided for under the law, including the remedies identified in New York Labor Law §740, which includes "compensation for lost wages, benefits and other remuneration" and "the payment by the employer of reasonable costs, disbursements, and attorney's fees."

67.     Shehadeh, therefore, seeks compensatory damages in this Third Cause of Action, including among other things, for the harm inflicted upon him, in an award to be determined at a

trial of this matter, as well as reasonable attorney's fees, the costs of this action and pre-judgment interest, in this cause of action.

**AS FOR A FOURTH CAUSE OF ACTION ON BEHALF
OF SHEHADEH AGAINST HORIZON PHARAMA FOR
<u>RETALIATION UNDER NEW YORK LABOR LAW §741</u>**

68.     Shehadeh peats, realleges and incorporates in full paragraphs 1 through 39 of this Complaint, as though fully set forth at length herein.

69.     Each time that Shehadeh protested and objected to Horizon Pharma's activity that was in violation of a law, rule or regulation, and created a substantial and specific danger to public health, he participated in a protected activity under New York Labor Law §741, of which Defendants were aware.

70.     As a proximate result of Shehadeh engaging in protected activity, Shehadeh suffered adverse employment action, including his termination, all of which was causally connected to his protected activity.

71.     Shehadeh brought his concerns regarding the improper quality of patient care to his supervisor at Horizon Pharma and afforded the company a reasonable opportunity to correct its activity, yet Horizon Pharma punished Shehadeh because of his complaints.

72.     The remarkably close temporal proximity between Shehadeh's complaint about Horizon Pharma's unlawful conduct on September 12, 2019, followed by his being reprimanded for things he did not do on September 19, 2019, and then being terminated based on those false allegations on October 10, 2019, demonstrates that the real reason for the adverse action against Shehadeh was his protected activity.

73.     The aforementioned acts of Horizon Pharma constitute unlawful retaliation against Shehadeh in violation of New York Labor Law §741, which provides, *inter alia* that:

> [N]o employer shall take retaliatory action against any employee because the employee does any of the following: (a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or (b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

74.     Horizon Pharma's unlawful conduct had a devastating impact on Shehadeh's employment, his financial and emotional well-being, the quality of his life and his life's normal pursuits, which injuries Shehadeh believes will continue to cause him significant damage.

75.     As a result of Horizon Pharma's violation of New York Labor Law §741, Horizon Pharma is liable to Shehadeh for all the legal, non-equitable relief provided for under the law, including the remedies identified in New York Labor Law §741, which includes "compensation for lost wages, benefits and other remuneration" and "the payment by the employer of reasonable costs, disbursements, and attorney's fees."

76.     Shehadeh, therefore, seeks compensatory damages in this Fourth Cause of Action, including among other things, for the harm inflicted upon him, in an award to be determined at a trial of this matter, as well as reasonable attorney's fees, the costs of this action and pre-judgment interest, in this cause of action.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial.

14

**WHEREFORE**, Shehadeh demands judgment against Horizon Pharma on all Four Causes of Action in an amount to be determined by the fact-finder, including compensatory and punitive damages, as well as costs, pre-judgment interest and attorney's fees, and for such other relief as this Court deems just and proper.

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*

By:_____
        BRIAN HELLER
        DAVIDA S. PERRY
        3 Park Avenue, Suite 2700
        New York, NY 10016
        (212) 889-6565